## The Alabama.

*(District Court, S. D. Alabama.  1884.)*

ADMIRALTY—MARITIME LIEN—VESSELS—DREDGE AND SCOWS.

Dredges and scows, though never used in the transfer of passengers or freight, and furnished with no motive power of their own, are vessels, and subject as such to maritime liens for services rendered and supplies furnished.

In Admiralty.

*Lyman H. Faith,* for Fobes & Co. and Michael Merrigan.

*Overall & Bestor* and *F. G. Bromberg,* for August Kling and Cavanagh, Barney & Brown.

*Pillans, Torrey & Hanaw,* for Hyer & Co. and Horsler and others.

*J. L. & G. L. Smith* and *R. H. Clark,* for claimants.

BRUCE, J.  A number of libels have been filed in this court against the dredge Alabama and two scows.  One of them is founded upon a claim for towage of the dredge and scows from Mobile bay, Alabama, to Tampa, in the state of Florida.  Another is for services of the operator of the dredge while engaged in her operation of dredging, and others are for materials and supplies furnished to the dredge. To these libels exceptions are filed, and one of the exceptions is common to all the libels, and excepts to the jurisdiction of the court on the ground that the claims or contracts sued on are not maritime contracts, and that no lien exists which can be enforced in the district courts of the United States as courts of admiralty.  The question raised is whether the things libeled (the dredge and scow) are of such a nature as to make them the subjects of a maritime contract and lien.  Evidence has been introduced to show the character of the dredge and scows, the manner in which they are built and constructed, the purpose for which they are constructed and used, and the mode by which they carry on the business of dredging.  The evidence shows that the hull of the dredge is built like the hull of other boats or vessels intended for navigation.  That she is strongly built to support heavy machinery placed upon her, including a steam-engine which furnishes the power necessary to operate the machinery used in dredging and deepening channels in the water-ways of commerce.  The scows are constructed like other decked scows, except that they have in them what are called wells, which are inclosed spaces open in the deck and closed at the bottom of the scows with doors, which wells or spaces receive the earth which is brought from the bottom of the channel by the dredging process, and when filled the barge is towed to some place where the earth is to be dumped, when, by opening the doors in the bottom of the wells the earth passes out, and the scow, relieved of its burden, rises up.  Neither the dredge nor the scows have rudder or masts, though it is in proof that some dredges similarly constructed do have masts and sails.  The dredge and scows

have no means of propulsion of their own except that the dredge, by the use of anchors, windlass, and rope, is moved for short distances, as required in carrying on the business of dredging. Both the dredge and the scows are moved from place to place where they may be employed by being towed, and some of the tows have been for long distances and upon the high seas. The dredge and scows are not made for or adapted to the carriage of freight or passengers, and the evidence does not show that, in point of fact, this dredge and scows had ever been so used and employed.

It is insisted that structures of the kind described are not vessels, and are not the subjects of admiralty and maritime jurisdiction; that contracts for the service or supply of such structures are not maritime contracts; that, in order to be so, they must pertain in some way to the navigation of a vessel having a carrying capacity and employed as an instrument of trade and commerce, and that the dredge and scows in question have no relation to commerce or navigation, and in no proper sense can be considered instruments of commerce. The function of a dredge and scows, such as we have been considering, is to clean out and deepen channels in the water-ways of commerce so as to aid and facilitate ships in their passage to and from, and while a service of this kind in aid of commerce is a very different thing from commerce itself, yet it could hardly be said to have no relation to commerce or navigation. The relation may not be the most direct, and the authority relied on is not so definite and clear as necessarily to exclude water-craft which may not be engaged or adapted to the carriage of freight and passengers.

In the case of *Thackarey* v. *The Farmer*, Gilp. 524, the rule is thus stated: "It (the service) must be a maritime service. It must have some relation to commerce or navigation, some connection with a vessel employed in trade. * * *"

In the case cited and relied on by the claimants, reported in Flippen, 543, where Judge Brown, in the Western district of Tennessee, had laid down the rule that the contract must pertain in some way to the navigation of a vessel having carrying capacity, it should be borne in mind that it was a case of a raft of logs that was before him, quite unlike the case at bar here. He says the contract must pertain in some way to the navigation of a vessel having carrying capacity; * * * and in the case of *The Farmer*, *supra*, it is said it must have some relation to commerce or navigation, which is certainly no very definite and exact statement of the rule, though perhaps as much so as the question admits, for it is often difficult and even impossible to formulate a general proposition in words that will unerringly suit every case.

To say that the dredge in question has some relation to commerce or navigation is perhaps no stretch of the rule at all, but upon this subject we are to bear in mind not only the idea of commerce in the sense of the carriage of freight and passengers, but the idea of navi-

gation comes into the question as well. The dredge and scow are constructed to float in and upon the waters, they are made to sail, and for navigation, and can be used only in and upon the waters. They may have no motive power of their own, and be moved only by power applied externally, still they have the capacity to be navigated in and upon the waters, and they are water-craft made for navigation, and the dredge in question has actually made voyages on the high seas.

The case of *Cope* v. *Vallette Dry-dock Co.*, in the Eastern district of Louisiana, reported in 10 Fed. Rep. 142, and decided on appeal to the circuit court, Justice Woods delivering the opinion, and the circuit judge (Pardee) concurring, reported in 16 Fed. Rep. 924, is claimed to be in opposition to this view, but I think it is not really so. That was a case of a claim for salvage services, and in the opinion the court says:

"The structure (a dry-dock) to which they (the services) were rendered, was not designed for navigation, and, being practically incapable of navigation, it had no more connection with trade or commerce than a wharf, a ship-yard, or a fixed dry-dock, into which water-crafts are introduced by being drawn up on the ways. As shown by the findings, it had remained securely and permanently moored to the bank for a period of more than 14 years; it partook more of the nature of a fixture attached to the realty than of a boat or ship."

To say that the dredge Alabama, in the light of the testimony adduced in this case, partook more of the nature of a fixture attached to the realty than of a boat or ship, is out of the question. It is essentially in its nature a boat or vessel; and the fact that to operate the dredge it is not necessary to have licensed officers or skilled seamen is not important, for that does not furnish the test or criterion by which the question is to be determined. The doctrine or rule upon this subject is more satisfactorily and more authoritatively stated by the supreme court of the United States, in the case of *The Rock Island Bridge*, 6 Wall. 216, where the court, speaking by Justice Field, say: "A maritime lien can only exist upon movable things engaged in navigation, or upon things which are the subjects of commerce on the high seas or navigable waters." The court goes on speaking more particularly to the case there under consideration, and says: "But it [a maritime lien] cannot arise upon anything which is fixed and immovable, like a wharf, a bridge, or real estate of any kind." Though bridges and wharves may aid commerce by facilitating intercourse on land, or the discharge of cargoes, they are not in any sense the subjects of a maratime lien. The court here distinctly recognizes mobility and capacity to navigate as a prime element, in determining what things are the subjects of maritime lien.

Tested by this rule, the scows and dredge in question must be held to be the subjects of a maritime lien. It will not do to say that every water-craft which is not used in the carrying of freight and passengers is therefore not engaged in and has no relation to commerce and

navigation. That is too narrow, is not sustained by the authorities, nor can it be sustained by right reason.

In support of these views, in addition to the cases cited and commented upon, the case of the floating elevator, *Hezekiah Baldwin,* 8 Ben. 556, and *Endner* v. *Greco,* 3 FED. REP. 411, may be cited.

The result is that the exception to the jurisdiction of the court is overruled.